

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARIA ISABEL GARCIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No: 04 C 3906 |
| ) | |
| ILLINOIS DEPARTMENT OF CHILDREN ) | Judge John W. Darrah |
| AND FAMILY SERVICES, PATRICIA DAVIS, ) | |
| CHARLES BOWDEN, TOM PUTTING, ) | |
| JESS McDONALD, YVONNE SALES, ) | |
| TIMOTHY SNOWDEN, and ) | |
| JONI STAHLMAN. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Maria Isabel Garcia, filed suit against Defendants, the Illinois Department of

Children and Family Services ("DCFS"); Yvonne Sales, Plaintiff's direct supervisor, who held

the position of Local Area Network ("LAN") Cluster Supervisor; Charles Bowden, Sales' direct

supervisor, who held the position of Resource Development Manager; Timothy Snowden, the

Regional Administrator for the Cook South region, who was Bowden's direct supervisor;

Patricia Davis, an Administrative Assistant/Personnel Liaison for the Cook South facility; Joni

Stahlman, who served as Chief of Labor Relations and/or as Acting Special Assistant to the

Director of DCFS; Tom Putting, the Chief of the Office of Employee Services for DCFS, who

was Stahlman's direct supervisor; and Jess McDonald, the Director of DCFS. (Defs' 56.1 ¶ 3-10,

15).

On December 15, 2005, Plaintiff filed a Third-Amended Complaint, alleging that from the summer of 2002 through the date of her termination on April 11, 2003, she was the victim of disability and religious discrimination, retaliation, and that her Constitutional rights to free speech, freedom of religion, and equal protection were violated. Plaintiff was sent for a fitness-for-duty evaluation, placed on disability leave, was not allowed to return to work; and her employment was terminated.

Presently before the Court is Defendants' Motion for Summary Judgment.

## LEGAL STANDARD

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

2

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

Plaintiff was employed by DCFS as a Child Welfare Specialist at the Cook South facility from 1980 through her employment termination in April of 2003. (Defs' 56.1 ¶ 2, 13). One of Plaintiff's significant job duties consisted of completing all paperwork and taking all steps necessary to ensure that foster homes were properly licensed. (Defs' 56.1 ¶ 14). From approximately June of 1996 through April of 2003, Plaintiff's direct supervisor, Yvonne Sales, evaluated Plaintiff's performance and gave her "satisfactory" or "exceeds" marks. (Defs' 56.1 ¶ 16).

Beginning in the summer of 2002, Sales noticed changes in Plaintiff's work performance, including Plaintiff's failure to complete the necessary paperwork to license several homes. Sales had to send Plaintiff several e-mail messages inquiring about the status of those homes. (Defs' 56.1 ¶ 17). During June and July of 2002, Sales received copies of several e-mail messages to Plaintiff from a caseworker from DCFS' Harvey office, Amy Gordon, regarding Plaintiff's failure to complete the necessary paperwork to license a foster home. (Defs' 56.1 ¶ 23).

Plaintiff also began exhibiting noticeable behavioral changes. (Pl's 56.1(b)(3)(B) ¶148). On July 22, 2002, Bowden observed that Plaintiff was crying at her desk. (Defs' 56.1 ¶ 35). Plaintiff was crying because, she claimed, someone removed one of her son's pictures from its frame and replaced it with a "human hair." (Defs' 56.1 ¶36). Neither Sales nor Bowden observed human hair in any of Plaintiff's picture frames. (Defs' 56.1 ¶ 37).

Sales referred Plaintiff to the Employee Assistance Program ("EAP"), which is a confidential program to assist employees if they are having problems. The EAP allows the employee to speak with someone outside of the office to determine the source of their problems. (Defs' 56.1 ¶ 18). Neither Sales nor Bowden knows if Plaintiff ever contacted the EAP or met with anyone from the EAP. (Defs' 56.1 ¶ 20). Being referred to the EAP is not considered discipline; and Plaintiff was not transferred, demoted, and did not lose any salary as a result of being referred to the EAP or because she did not participate in the EAP. (Defs' 56.1 ¶¶ 20-21).

In late July or early August of 2002, Plaintiff asserted that things were taken from her work area; and a meeting was held to discuss Plaintiff's allegation. Present at this meeting were Bowden, Snowden, Sales, Plaintiff, and Plaintiff's union representative. (Defs' 56.1 ¶ 38).

On or about August 7, 2002, Sales asked Plaintiff for one of Plaintiff's files to review to answer some licensing questions. (Defs' 56.1 ¶ 39). Plaintiff stated, "Can you come back? I can't look for the file right now." (Defs' 56.1 ¶ 40). Sales told Plaintiff that she needed the file, but Plaintiff refused to provide the requested file. (Defs' 56.1 ¶ 41). Sales located another licensing supervisor, Ruth Singleton, who accompanied Sales to Plaintiff's work area. (Defs' 56.1 ¶ 42). In the presence of Ms. Singleton, Sales gave Plaintiff a directive to give her the

4

requested work file, to which Plaintiff responded that she had to go to the restroom. (Defs' 56.1 ¶ 43). Sales believed Plaintiff's actions were insubordinate and informed Bowden and Seth Hosick of Plaintiff's actions. (Defs' 56.1 ¶ 45).

On August 7, 2002, Sales received a copy of an e-mail message that Plaintiff sent to Womazetta Jones, stating that Plaintiff believed that Ms. Jones' placement of three "Do Not Disturb" signs on her door intimidated Plaintiff. (Defs' 56.1 ¶ 46). Ms. Jones worked in a different area than Plaintiff, and Plaintiff had never worked directly with Ms. Jones on any of her cases. (Defs' 56.1 ¶ 47). Sales believed it was odd that Plaintiff sent such an e-mail message to an employee with whom she does not work. (Defs' 56.1 ¶ 48). A meeting was held to discuss this issue. Present at the meeting were Bowden, Snowden, Sales, Plaintiff, and Plaintiff's union representative. (Defs' 56.1 ¶ 50).

Additionally, Plaintiff believes Defendants tried to limit her from: (1) her use of the phrase "bendito" and (2) making the sign of the cross. (Defs' 56.1 ¶ 122).

In late July or early August 2002, Sales and Bowden notified Snowden of Plaintiff's work performance problems and unusual behavior. (Defs' 56.1 ¶ 52). On or about August 6, 2002, in response to Snowden's request, Bowden sent an e-mail to Snowden, which described Plaintiff's performance problems and erratic behavior. (Defs' 56.1 ¶¶ 53-54).

After Snowden reviewed information he received from Bowden regarding Plaintiff's work performance problems and unusual behavior, Snowden (who did not have the authority to send an employee for a fitness-for-duty evaluation) sent a request to his supervisor, Jerome Slomka, to send Plaintiff for a fitness-for-duty examination based on this information. (Defs' 56.1 ¶¶ 55, 57). Snowden's request included this chronology of events. (Defs' 56.1 ¶ 57).

5

After reviewing the supporting documentation, Slomka approved Snowden's request to send Plaintiff for a fitness-for-duty examination so that a medical expert could determine whether Plaintiff could perform the duties of her position. (Defs' 56.1 ¶¶ 58, 59). Defendant Patricia Davis, the Administrative Assistant/Personnel Liaison for the Cook South facility informed Plaintiff that this decision had been made; but Davis did not have any involvement or input in the decision by DCFS to require Plaintiff to undergo a fitness-for-duty examination. (Defs' 56.1 ¶ 133).

On August 9, 2002, Slomka received an e-mail message from Snowden, which requested that DCFS place Plaintiff on paid administrative leave pending the outcome of the fitness-for-duty examination. (Defs' 56.1 ¶ 60). It was Slomka's understanding that Plaintiff's direct supervisor, Sales, had articulated safety concerns if Plaintiff continued to work at DCFS because of Plaintiff's recent behavior towards Sales. Therefore, Slomka approved Snowden's request to place Plaintiff on administrative leave pending the outcome of the examination. (Defs' 56.1 ¶ 61).

On August 14, 2002, Plaintiff attended the fitness-for-duty examination with Dr. Harley Rubens. (Defs' 56.1 ¶ 62). Dr. Rubens diagnosed Plaintiff with Brief Reactive Psychosis and concluded that Plaintiff was unable to perform any of her job duties for DCFS. (Defs' 56.1 ¶ 63).

On or about August 23, 2002, Plaintiff was informed that because she was diagnosed as being unable to perform the duties of her position, she had the option of requesting a medical leave of absence, using accrued benefit time, transferring to another state agency, or

6

resigning. (Defs' 56.1 ¶ 64). Plaintiff requested to be placed on disability leave. (Defs' 56.1 ¶ 65). Snowden approved Plaintiff's request to be placed on disability leave. (Defs' 56.1 ¶ 66).

On August 30, 2002 Plaintiff sent a memorandum to Putting. (Pl's 56.1(b)(3)(B) ¶ 145). The subject line in the memorandum read: "Discrimination against employees in Cook County Ex: 6201 S. Emerald, myself, and other co-workers." (Pl's 56.1(b)(3)(B) ¶¶ 145-46). The letter detailed Plaintiff's concerns about the reasons why she was placed on leave. (Pl's 56.1(b)(3)(B) ¶145; Ex. #6 to Putting Dep.). Putting did not conduct any investigation of the matters raised in the letter. (Pl's 56.1(b)(3)(B) ¶146).

Plaintiff testified that from June 2002 through February 2003, she was severely restricted in her ability to eat, sleep, exercise, concentrate, care for her daughter, interact with her family and friends, and perform daily activities – such as cooking, cleaning, doing laundry or caring for herself. From August 2002 through February 2003, Plaintiff was also substantially limited in her ability to work at any occupation. (Pl's 56.1(b)(3)(B) ¶149).

On September 12, 2002, Plaintiff provided DCFS with a physician's statement from Dr. Cosme Lozano, who had diagnosed Plaintiff with Adjustment Disorder and Depression and stated that Plaintiff was temporarily totally disabled from returning to work for DCFS. (Defs' 56.1 ¶ 67). On or about September 30, 2002, Plaintiff received a letter from DCFS, which notified her that her request for disability leave was approved and would expire on October 15, 2002. (Defs' 56.1 ¶ 68).

On October 15, 2002, the date Plaintiff's disability leave was to expire, Plaintiff submitted an updated physician's statement to DCFS from Dr. Lozano, which stated Plaintiff was still temporarily totally disabled from working for DCFS and that he believed Plaintiff would be

7

able to return to work for DCFS on approximately December 15, 2002. (Defs' 56.1 ¶¶ 71-72). On or about October 17, 2002, Plaintiff received a letter from DCFS, which notified her that her request for an extension of her disability leave was approved and would expire on December 16, 2002. (Defs' 56.1 ¶ 73).

Plaintiff did not return to work on December 16, 2002. On December 17, 2002, DCFS Human Resources Specialist Doug Mathis sent Plaintiff a letter, which stated that by January 2, 2003, Plaintiff was to provide DCFS with an updated physician's statement that either cleared her to return to work or supported a need for Plaintiff to remain on disability leave and that, if not, the Agency could begin termination proceedings against Plaintiff. (Defs' 56.1 ¶ 78). Mathis did not receive an updated physician's statement from Plaintiff between
December 16, 2002 and January, 2003. (Defs' 56.1 ¶ 83).

Plaintiff told both Mathis and Kelli Talarico, a DCFS employee, that Plaintiff could not get an appointment with her doctor until January 16, 2003. (Defs' 56.1 ¶ 84; Pl's 56.1(b)(3)(B) ¶157). Stahlman was also aware (by way of emails between Mathis, Putting, Christina Griffen and herself) that Plaintiff had an appointment scheduled with her doctor on January 16, 2003. (Pl's 56.1(b)(3)(B) ¶158). Nevertheless, on January 9, 2003, a week before Plaintiff's scheduled appointment, Stahlman recommended that DCFS proceed with discipline against Plaintiff. (Pl's 56.1(b)(3)(B) ¶158).

Plaintiff did not notify anyone at DCFS that she did not attend her January 16, 2003 doctor's appointment or that the appointment had been rescheduled to February 6, 2003. (Defs' 56.1 ¶ 86). Neither Mathis nor Stahlman received an updated physician's statement from Plaintiff by January 31, 2003. (Defs' 56.1 ¶ 88).

8

On February 6, 2003, Plaintiff provided Mathis with an updated physician's statement, which cleared her to return to work, without restrictions, effective February 13, 2003. (Defs' 56.1 ¶ 98). Plaintiff was capable of performing her duties as a Child Welfare Specialist, without restrictions, as of February 13, 2003. (Pl's 56.1(b)(3)(B) ¶154).

Stahlman had signature authority from the Director of DCFS, Jess McDonald, for termination decisions and was the DCFS employee who made the decision within DCFS to proceed with Plaintiff's termination based on Plaintiff's failure to return from leave. (Defs' 56.1 ¶ 88). Stahlman's recommendation was approved; and Plaintiff was terminated effective April 11, 2003. (Defs' 56.1 ¶ 102). Davis had no involvement or input in the decision to discipline Plaintiff for failure to provide certification for continued leave, the decision to suspend Plaintiff pending decision or discharge, or the decision to terminate Plaintiff. (Defs' 56.1 ¶ 135).

After the pre-disciplinary meeting in January 2003, Plaintiff made repeated phone calls to Kelli Talarico in February and March 2003 regarding her desire to return to work; Stahlman, Mathis and Putting were aware of these calls. This did not cause DCFS to re-evaluate its decision to discharge her. (Pl's 56.1(b)(3)(B) ¶159).

Neither Putting, Mathis nor Stahlman ever discussed with anyone at DCFS that granting Plaintiff an extension of her disability leave until she could get an appointment with her doctor might be a reasonable accommodation of her disability. (Pl's 56.1(b)(3)(B) ¶161). Neither Putting nor Mathis ever discussed any other possible accommodation of Plaintiff's disability with anyone at DCFS. (Pl's 56.1(b)(3)(B) ¶162).

Stahlman discussed with Putting and Tracie Crockrell, a DCFS employee in the Chicago office, that if Plaintiff provided evidence of her inability to see her doctor until January 16, 2003,

9

DCFS would consider such evidence in determining what discipline to impose on Plaintiff. Stahlman, however, never told Plaintiff that written documentation of her oral communication to Mathis and Talarico was required. (Pl's 56.1(b)(3)(B) ¶163).

Neither Putting nor Mathis are aware of any discussions within DCFS regarding possible accommodations of Plaintiff's disability. ((Pl's 56.1(b)(3)(B) ¶164). Neither Putting, Mathis nor Stahlman ever attempted to communicate with Plaintiff regarding whether Plaintiff's request for an extension of her disability leave was a reasonable accommodation of her disability. (Pl's 56.1(b)(3)(B) ¶165). Neither Putting, Mathis nor Stahlman ever initiated any conversations with Plaintiff about alternative accommodations of her disability. (Pl's 56.1(b)(3)(B) ¶166). No one at DCFS ever attempted to communicate with Plaintiff about whether extending her disability leave until she could get an appointment with her doctor was a reasonable accommodation of her disability. (Pl's 56.1(b)(3)(B) ¶167). No one at DCFS ever sought out or communicated with Plaintiff about alternative accommodations for her mental disability. (Pl's 56.1(b)(3)(B) ¶168). Neither Putting, Mathis nor Stahlman considered that Plaintiff might be entitled to a reasonable accommodation of her mental disability, nor are they aware of anyone at DCFS that considered this. (Pl's 56.1(b)(3)(B) ¶169). Neither Putting, Mathis nor Stahlman ever communicated with Plaintiff's former managers, Sales, Bowden or Snowden – about the possibility of Plaintiff's returning to her Child Welfare Specialist position or about her ability to perform the essential functions of her position after her doctor cleared her to return to work in February 2003. (Pl's 56.1(b)(3)(B) ¶170). Neither Putting, Mathis nor Stahlman are aware of anyone in the Office of Employee Services who communicated with Plaintiff's former managers about the possibility of Plaintiff's returning to her Child Welfare Specialist position. (Pl's 56.1(b)(3)(B) ¶171). No one at

10

DCFS proposed an alternative accommodation of Plaintiff's disability or mentioned the words "reasonable accommodation" to Plaintiff. (Pl's 56.1(b)(3)(B) ¶¶ 173-74). Stahlman did not question Dr. Lozano's February 6, 2003 decision to allow Plaintiff to return to work without restrictions on February 13, 2003. (Pl's 56.1(b)(3)(B) ¶176).

DCFS has an Americans with Disabilities Act ("ADA") policy, which prohibits discrimination against employees with disabilities. (Pl's 56.1(b)(3)(B) ¶ 139). The ADA policy includes a section on Reasonable Accommodation. (Pl's 56.1(b)(3)(B) ¶ 139). It states, "a reasonable accommodation may be requested if an employee is suffering from a permanent or temporary disability that impairs his/her ability to function in the workplace. The employee may request a modification of his/her . . . work schedule, etc. in order to continue gainful employment with the Department." (Pl's 56.1(b)(3)(B) ¶ 139).

Sales, Bowden, Snowden, Mathis, Putting, Stahlman and McDonald were each aware of DCFS' ADA policy and their obligations not to discriminate against and to reasonably accommodate employees with disabilities. (Pl's 56.1(b)(3)(B) ¶ 140). Putting, Stahlman and Mathis each testified that if an employee requested a reasonable accommodation directly from him/her, he/she would refer the employee to DCFS' Office of Affirmative Action. (Pl's 56.1 (b)(3)(B) ¶ 141).

DCFS has a Disability Leave policy, which allows leave to be granted for "the duration of the [employee's] disability." (Pl's 56.1(b)(3)(B) ¶ 142). During 2002 and 2003, the duration that a DCFS employee could remain on Disability Leave was limited only by the parameters of a physician's statement -- there was no time limit on how much disability leave an employee could

11

take. (Pl's 56.1(b)(3)(B) ¶ 142). During 2002-2003, an employee could remain on disability leave for two or more years. (Pl's 56.1(b)(3)(B) ¶ 142).

DCFS has a Prohibition Against Discrimination policy which prohibits discrimination against an employee on the basis of an employee's religion or disability. (Pl's 56.1(b)(3)(B) ¶ 143). Sales, Bowden, Snowden, Mathis, Putting, Stahlman and McDonald were each aware of DCFS' non-discrimination policy and their obligations not to discriminate against employees on the basis of the employee's religion. (Pl's 56.1(b)(3)(B) ¶ 144).

Putting is not aware of any other DCFS employee on disability leave who failed to provide an updated physician's statement to DCFS by the date of the expiration of their disability or by the date of the employee's pre-disciplinary meeting and was not terminated for failure to return from leave. (Defs' 56.1 ¶ 96).

Plaintiff identified three individuals she asserts are similarly situated: Clarence Bell, and two people identified only by their initials – A.M. and S.A.

Bell was a Child Welfare Specialist who worked at the same facility as Plaintiff and was also supervised by Sales. (Pl's 56.1(b)(3)(B) ¶178). Bell was placed on disability leave. In a letter written by DCFS dated November 14, 2001, Bell's disability leave was scheduled to expire on February 1, 2002. (Pl's 56.1(b)(3)(B) ¶179). Bell did not return to work when his disability leave expired on February 1, 2002; and he did not provide additional documentation before his leave expired. (Pl's 56.1(b)(3)(B) ¶180). Unlike Plaintiff, Bell was not sent a "last chance" letter on the day after his leave expired; Bell did not receive a "last chance" letter until 2 ½ months after his leave expired. (Pl's 56.1(b)(3)(B) ¶180). On June 20, 2002, more than four months after his leave expired, a Labor Relations representative implored Stahlman to accommodate

Bell's mental illness by allowing him to retire, as opposed to being discharged. He wrote, "Joni, Is there anything we can do with this guy besides discharge, or having him resign? . . . like allowing him to retire. . . . The fact is this worker may be mentally unfit to work (judging from incidents I was privy to last year, and fairly recent hospitalization for mental illness), and probably didn't even pick up his mail (or he was unable to comprehend it), when OES sent out the current letter to extend his leave." (Pl's 56.1(b)(3)(B) ¶181). Labor Relations scheduled a pre-disciplinary meeting for Bell on July 2, 2002. DCFS allowed Bell to retire on September 30, 2002. (Pl's 56.1(b)(3)(B) ¶183).

DCFS did not begin termination proceedings against "A.M." for failing to timely submit requested medical documentation. (Pl's 56.1(b)(3)(B) ¶171). Instead, DCFS granted her seven additional extensions of her disability leave and sent her two additional "last chance" letters. (Pl's 56.1(b)(3)(B) ¶171). A.M. was not terminated for failing to timely provide DCFS with updated medical documentation that either cleared her to return to work or substantiated her need to remain on disability leave. (Pl's 56.1(b)(3)(B) ¶186).

The employee identified as "S.A." worked in the same facility as Plaintiff and received non-service connected disability leave. S.A. was on such leave from approximately June 17, 2002 to November 14, 2002. DCFS sent S.A. a "last chance letter" on September 27, 2002, giving her until October 7, 2002, to produce updated medical documents. S.A. did not submit updated medical documents until October 10, 2002, three days after DCFS' deadline. (Pl's 56.1(b)(3)(B) ¶187). DCFS did not begin termination proceedings against S.A. for failing to timely submit requested medical documentation and granted her an extension of her disability leave. (Pl's 56.1(b)(3)(B) ¶188). S.A. was not terminated for failing to timely provide DCFS

13

with updated medical documentation that either cleared her to return to work or substantiated her need to remain on disability leave. (Pl's 56.1(b)(3)(B) ¶189).

Prior to her termination, in September of 2002, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights. (Defs' 56.1 ¶ 118). No one told Plaintiff that they were aware that she had filed a charge with the Illinois Department of Human Rights ("IDHR") or a federal complaint. (Defs' 56.1 ¶ 129). No one told Plaintiff that they had taken any action or made any comment because she had filed a charge with the IDHR or a federal complaint. (Defs' 56.1 ¶ 130).

Neither Bell, A.M., nor S.A. filed a charge of discrimination with the IDHR or the Equal Employment Opportunity Commissions ("EEOC"). (Pl's 56.1(b)(3)(B) ¶190).

## ANALYSIS

### *Americans with Disabilities Act*

Under ADA, it is illegal for an employer to fail to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112 (b)(5)(A). To establish a reasonable accommodation claim, a plaintiff must show: (1) that she is a qualified individual with a disability; (2) that the employer was aware of her disability; and (3) that the employer failed to reasonably accommodate the disability. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

Plaintiff alleges that the Defendants failed to provide her with a reasonable accommodation by refusing to extend her disability leave and by terminating her employment.

14

The Defendants concede the second prong of the reasonable accommodation analysis (that it was aware of Plaintiff's medical condition) but assert that Plaintiff cannot establish the first or third prongs. Specifically, the Defendants assert that Plaintiff is neither a person with a disability within the meaning of the ADA nor qualified. Also, Defendants assert that Plaintiff cannot prevail because her requested accommodation – additional disability leave – is not reasonable.

The first prong has two components: first, whether a plaintiff's impairment qualifies as a "disability" within the meaning of the ADA; and, second, whether the plaintiff is considered "qualified" for the position that she holds or seeks. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-1022 (7th Cir. 1997).

To be considered a "disability" covered under the ambit of the ADA, a plaintiff must: have an impairment; that impairment must impact one or more major life activities; and the limitation on the plaintiff's major life activities must be substantial. 42 U.S.C. § 12102(2). The Defendants concede that Plaintiff's mental health condition constitutes an impairment. The Defendants also concede that the major life activities upon which Plaintiff relies – specifically, eating, sleeping, exercising, concentrating, caring for children, interacting with family and friends, and performing daily activities – constitute major life activities. The Defendants assert, however, that Plaintiff's claim under the ADA fails because she cannot meet the final threshold requirement for establishing that she is disabled within the meaning of the ADA, as her

15

restrictions did not "substantially limit" her major life activities. A substantial-limitation analysis requires an individualized analysis of the plaintiff's mental impairment, *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), considering: (1) its nature and severity, (2) its duration or expected duration, and (3) the permanent or long-term impact or its expected long-term impact. 29 CFR § 1630.2(j)(2).

The Defendants argue that Plaintiff's claim strains the intent and meaning of the ADA in that Plaintiff's restriction was not expected to be "permanent or of a long duration," as required by 29 C.F.R. § 1630.2(j)(2). The Defendants argue that the application of the ADA to impairments such as Plaintiff's would extend the ADA protection to persons placed in a leg cast for a period of six months following a car accident.

The Defendants' argument is not persuasive. Mental health conditions, such as those experienced by Plaintiff, are unlike the physical impairment where the course of healing is routine and generally predictable (the person with an injured leg wears a cast for a fixed time period, after which the person typically recovers and suffers no long-term impact). As the EEOC Guidelines recognize, mental health conditions "may be long-term, or potentially long-term, *in that their duration is indefinite and unknowable or is expected to be at least several months.*" EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (EEOC Notice Number 915.002, March 25, 1997) ("EEOC Notice Number 915.002")(emphasis added).

16

Here, the undisputed facts establish that Plaintiff experienced the symptoms of mental health illness for a period of many months. While the ADA does exclude from coverage persons with temporary medical conditions, *Waggoner v. Olin Corporation*, 169 F.3d 481, 484 (7th Cir. 1999), under the ADA, mental health conditions as described above, if severe, may constitute disabilities. (EEOC Notice Number 915.002).

Plaintiff bears the burden of establishing that she is "qualified." *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 n. 3 (7th Cir. 1995). Qualified persons with disabilities are those "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' [29 C.F.R. app. § 1630.2(m)]. Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.' [29 C.F.R. app. § 1630.2(m)]." *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). The Defendants concede Plaintiff possessed the prerequisites for the employment position. The Defendants assert, however, that Plaintiff cannot establish that she was able to perform the essential functions of her job, with or without a reasonable accommodation.

Plaintiff must show that she was "qualified" for her position at the time of the adverse employment action. *Cf. Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). Based on the undisputed facts, there is a factual issue as to two claimed adverse employment actions: the failure to extend Plaintiff's disability leave from December 16, 2002 to February 13, 2003; and Plaintiff's termination effective April 11, 2003. (Defs' 56.1, Ex. G (6)). On February 6, 2003,

17

Plaintiff provided Mathis with an updated physician's statement, which cleared her to return to work, without restriction or accommodation, effective February 13, 2003. (Defs' 56.1 ¶ 98). Plaintiff asserts that if she were provided with the reasonable accommodation – i.e., extended disability leave – she would have been qualified for her position. When Plaintiff was terminated, she was arguably qualified and able to return to work without accommodation based on the physician's statement.

The third prong requires a showing that the Defendants failed to reasonably accommodate Plaintiff's disability. *Sieberns*, 125 F.3d at 1021-1022. Plaintiff asserts she would have been able to perform the essential functions of her job if the Defendants accommodated her disability by extending her leave until February 13, 2003, when she requested several additional months of leave as a reasonable accommodation on November 26, 2002.[1]

The Defendants deny that the extension of disability leave was a reasonable accommodation and, citing *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003), argue that the Seventh Circuit has rejected leave of this type as a reasonable accommodation. In *Byrne*, the plaintiff suffered from depression and often slept at work due to problems sleeping, which were caused by depression. *Byrne*, 328 F.3d at 380. Bryne was absent from work for two months while receiving treatment, and his employer terminated his employment. *Byrne*, 328 F.3d at 380. Byrne filed a complaint, alleging that his employer's actions violated the ADA. *Byrne*, 328 F.3d at 380. Byrne asserted that his employer should have provided him with a reasonable accommodation by allowing him not to work for approximately 1½ -2 months while he received

---

[1]  The Defendants claim that such a request was not received, as noted above. However, in viewing a motion for summary judgment, the facts must be construed in the light most favorable to the non-moving party.

18

medical treatment. *Byrne*, 328 F.3d at 380. The Defendants cite the Seventh Circuit's holding

that:

> As a result [of Byrne's inability to work for approximately 2 months] he was
> incapable of working. Byrne acknowledges this but contends that he should have
> been accommodated by being allowed *not* to work. That is not what the ADA
> says. The sort of accommodation contemplated by the Act is one that will allow
> the person to 'perform the essential functions of the employment position.' Not
> working is not a means to perform the job's essential functions. An inability to do
> the job's essential tasks means that one is not "qualified;' it does not mean that the
> employer must excuse the inability. . . . Byrne did not want a few days off or a
> part-time position; his only proposed accommodation is not working for an
> extended time, which as far as the ADA is concerned confesses that he was not a
> 'qualified individual' in late 1998. . . . Inability to work for a multi-month period
> removes a person from the class protected by the ADA.

*Byrne*, 328 F.3d at 380-81 (emphasis in original).

However, the Seventh Circuit has not held temporary disability leave (such as that

awarded Plaintiff, albeit on a limited basis) as *de facto* unreasonable accommodation. The *Byrne*

court also held that: "Time off may be an apt accommodation for intermittent conditions.

Someone with arthritis or lupus may be able to do a given job even if, for brief periods, the

inflammation is so painful that the person must stay home. *See Haschmann v. Time Warner*

*Entertainment Co.*, 151 F.3d 591 (7th Cir.1998). *Cf. Pals v. Schepel Buick & GMC Truck, Inc.*,

220 F.3d 495, 498 (7th Cir.2000) (part-time work may accommodate a person recovering from a

medical problem)." *Byrne*, 328 F.3d at 381.

In *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591 (7th Cir.1998)

*(Haschmann),* the court reviewed a jury verdict entered in favor of the plaintiff, Haschmann.

Haschmann had an occurrence of lupus complications and went on medical leave on

September 21, 2005. Haschmann returned to work on October 9, 1995; but on October 26, 1995,

19

she had another relapse, which required a second leave of absence, and was fired on November 3, 1995. Also on November 3, 1995, the defendant received a letter from Haschmann's attorney, saying Haschmann would be absent on medical leave for two to four weeks. *Haschmann*, 151 F.3d at 594-95. The Seventh Circuit held: "In our view, there was sufficient evidence from which a reasonable juror could conclude that the second medical leave, as requested, would have been a reasonable accommodation." *Haschmann*, 151 F.3d at 601.

Here, as in *Haschmann*, Plaintiff requested an extension of temporary disability leave. Although "in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability," *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999), Plaintiff's absences have not been shown to be erratic or unexplained. DCFS had granted Plaintiff disability leave until December 16, 2003. Plaintiff sought additional leave until February 13, 2003. "The reasonableness of a requested accommodation is a question of fact." *Haschmann*, 151 F.3d at 601. By the time that Plaintiff was terminated, she was cleared to return to work without accommodation. Further, three other DCFS employees (Clarence Bell, A.M. and S.A.) were provided extended disability leave and were not terminated. Thus, summary judgment is denied on Plaintiff's reasonable accommodation claim under the ADA.

### Religious Discrimination

Under Title VII of the Civil Rights Act of 1964, it is unlawful to discharge or to otherwise discriminate against an individual because of that individual's religion. 42 U.S.C. § 2000e-2(a)(1). "Religion" is defined to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). A Title VII claim of religious discrimination can be

established either by presenting direct evidence of discrimination or by the indirect method under the *McDonnell Douglas* burden-shifting analysis. *Venters v. City of Delphi*, 123 F.3d 956, 972-73 (7th Cir. 1997) *(Venters)*. Plaintiff asserts direct evidence of religious discrimination.

"Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination. . . . Evidence of discriminatory motives must, it is true, have some relationship with the employment decision in question; inappropriate but isolated comments that amount to no more than 'stray remarks' in the workplace will not do." *Venters*, 123 F.3d at 972 -973. Plaintiff asserts that the removal of religious items from Plaintiff's cubical, being told by Sales and Snowden to stop performing the sign of the cross and to stop saying "bendito," and Snowden's acknowledgement that Plaintiff's performance of the sign of the cross was one of the reasons she was required to undergo a fitness-for-duty examination constitute direct proof of discrimination. Further, Stahlman, the DCFS employee who terminated Plaintiff, was aware of Plaintiff's performance of the sign of the cross.

"[R]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality. . . . Proof of this nature supports the inference that a statutorily proscribed factor – race, sex, age, or in this case, religion – was at least a motivating factor in the adverse employment action at issue. This in turn activates a burden on the part of the employer to demonstrate that it would have taken the same action against the plaintiff even if the proscribed criterion had played no role in its decision." *Venters*, 123 F.3d at 972 -973. The Defendants respond that Snowden's testimony in which he admitted

21

that Plaintiff's performance of the sign of the cross was at least one of the factors that led him to request that Plaintiff be sent for a fitness-for-duty examination was not evidence of discrimination because it was not because of the sign's religious connotation that lead him to this recommendation but rather because Snowden thought Plaintiff's performance of the sign of the cross was merely one example of unusual behavior by Plaintiff.

"The persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters,* 123 F.3d at 973. Here, this cannot be found. There remains material issues of fact with respect to the actions of the Defendants regarding Plaintiff's claim of religious discrimination.

### *Retaliation*

Plaintiff admittedly has no direct evidence of retaliation; and she must, therefore, proceed under the indirect method. (Defs' 56.1, ¶¶ 129-130). Under the indirect method, in order to establish a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) she engaged in protected activity, such as filing a charge of discrimination; (2) she was subject to an adverse employment action; (3) she was performing her job satisfactorily; and (4) no similarly situated employee who did not file a charge was subjected to the adverse employment action. *Mannie,* 394 F.3d at 984 (internal citation omitted). The Defendants concede that Plaintiff engaged in protected activity when she filed a charge with the Illinois Department of Human Rights in September of 2002, that she was subject to an adverse employment action when she was terminated in April 2003, and that she performed her job satisfactorily up until June 2002 and was able to return to her position without restriction as of February 2003.

However, Plaintiff cannot meet her burden of establishing a *prima facie* case of retaliation under the indirect method because she cannot establish that a similarly situated employee who did not participate in a protected activity received more favorable treatment. With respect to Plaintiff's termination, Plaintiff was terminated for her failure to timely provide DCFS with updated medical documentation that either cleared her to return to work or substantiated her need to remain on disability leave. (Defs' 56.1, ¶¶ 92-94). Plaintiff admits that she is not aware of any employee who failed to submit updated medical documents to DCFS before the expiration of their leave and who did not file a charge of discrimination and was not terminated. (Defs' 56.1, ¶ 121). Therefore, Plaintiff cannot demonstrate that a similarly situated employee who did not participate in a protected activity received more favorable treatment. Plaintiff's retaliation claim must fail. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002); *Lalvani v. Cook County*, 269 F.3d 785, 789 (7th Cir. 2001). Moreover, Plaintiff has not shown the DCFS employees involved in the disciplinary decisions at issue were aware that Plaintiff had filed a charge until *after* her termination. (Defs' 56.1 at ¶ 119). Summary judgment is granted in favor of the Defendants with respect to Plaintiff's retaliation claim.

### 42 U.S.C. §1983 Claims

Plaintiff asserts claims under 42 U.S.C. § 1983, alleging that the Defendants violated her First Amendment rights to freedom of speech and religion when she made the sign of the cross gesture across her chest and voiced various sentiments regarding her relationship with and belief in God. (Compl. at ¶ 60).

The Defendants assert that Plaintiff's 42 U.S.C. §1983 claim is untimely. *Fillmore v. Page*, 358 F.3d 496, 508 (7th Cir. 2004) (internal citation omitted). Plaintiff was terminated in

23

April of 2003 but did not name Snowden or Stahlman as defendants until she filed her Third-

Amended Complaint on December 15, 2005, beyond the two-year statute of limitations period.

(Defs' 56.1, ¶ 12). Plaintiff asserts these claims are timely because they relate back to the date of

the original pleading. Federal Rule of Civil Procedure 15(c) allows a pleading to relate back to

the date of the original pleading when:

> (2) the claim or defense asserted in the amended pleading arose out of the
> conduct, transaction, or occurrence set forth or attempted to be set forth in the
> original pleading, or
> (3) the amendment changes the party or the naming of the party against whom a
> claim is asserted if the foregoing provision (2) is satisfied and, within the period
> provided by Rule 4(m) for service of the summons and complaint, the party to be
> brought in by amendment (A) has received such notice of the institution of the
> action that the party will not be prejudiced in maintaining a defense on the merits,
> and (B) knew or should have known that, but for a mistake concerning the identity
> of the proper party, the action would have been brought against the party.

Fed. R. Civ. P. 15(c). Plaintiff asserts that the claims against Snowden and Stahlman meet these

criteria because in her original *pro se* complaint filed on June 8, 2004, Plaintiff alleged that she

was ordered not to perform the sign of the cross, that DCFS discharged her despite her doctor's

order that she could return to work on February 13, 2003, and that Snowden and Stahlman were

individuals responsible for those actions. Rule 15(c) requires that the new party had "actual

notice." Here, Snowden and Stahlman were put on notice of their potential liability when

Plaintiff named DCFS in her original complaint.

Assuming *arguendo* that Snowden and Stahlman did not have actual notice, the statute of

limitations should be equitably tolled. *Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548,

561-62 (7th Cir. 1996). Plaintiff filed her initial complaint *pro se*. Counsel was not appointed

until June 17, 2004 (and counsel was not informed of the appointment until August 2004), just

24

over a month before the statute of limitations expired against Snowden for telling her not to perform the sign of the cross. Plaintiff was not permitted leave to amend her Complaint on August 20, 2004, which prevented her from bringing a claim against Snowden within the statute of limitations. Then, due to the time necessary to brief and resolve Defendants' motions to dismiss, discovery did not begin until June 2005, well after the statute of limitations had run against Stahlman based on her January 2003 order to commence termination proceedings. Plaintiff first learned during discovery that it was Stahlman – and not McDonald – who made the decision to terminate her. Therefore, Plaintiff's action is not time barred.

When a government employee alleges that their right to freedom of speech was violated, it must be determined whether the First Amendment protects the employee's speech by conducting the two-part analysis. *Pickering v. Board of Education*, 391 U.S. 563 (1968) *(Pickering)* and *Connick v. Myers*, 461 U.S. 138 (1983) *(Connick)*.

*Connick-Pickering* first require that the Court consider whether the speech in question addresses a matter of public concern. *Delgado v. Jones*, 282 F.3d 511, 516 (7th Cir. 2002) *(citing Connick*, 461 U.S. at 147) *(Delgado)*. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. The Seventh Circuit has determined that the content of the speech is the most important consideration. *Delgado*, 282 F.3d at 517.

The Defendants assert that Plaintiff has failed to establish that the "speech" at issue was a matter of public concern. Plaintiff asserts that sign of the cross, a religious gesture, and Plaintiff's religious pictures constitute nonverbal speech of sufficient public concern to garner protection by the First Amendment, citing *Altman v. Minnesota Dep't of Corrections*, 251 F.3d

1199, 1202 (8th Cir. 2001) and *Moncivaiz v. DeKalb County*, No. 03 C 50226, 2004 WL 539994, * 2 (N.D. Ill. March 12, 2004). However, unlike the cases cited by Plaintiff, here her speech (and nonverbal speech) was not a matter of public concern. The complaining party in both *Altman* and *Moncivaiz* took some action specifically because the employment practice at issue was at odds with one of their religious beliefs. In this case, Plaintiff never claimed that her performance of the sign of the cross, saying "bendito," or posting religious items were a form of protest against some a DCFS practice that offended her religious beliefs (*Altman*) or that any of Defendants' policies were in direct conflict with any of her religious beliefs (*Moncivaiz*). Thus, Plaintiff cannot establish that the alleged religious activity was protected speech on a matter of public concern; and summary judgment is entered in favor of the Defendants on this claim.

Because Plaintiff cannot meet the threshold test of showing that her speech was a matter of public concern, there is no need to analyze her claim in terms of the second prong of the *Connick-Pickering* test, which requires the determination of whether "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) (*quoting Pickering*, 391 U.S. at 568); *see also Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006) ("*Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.") (internal citations omitted).

26

Plaintiff alleges that her right to freedom of religion was violated when she was told not to make the sign of the cross and her religious items were removed. (Defs' 56.1, ¶ 123). The Defendants assert that because Plaintiff failed to identify any policy within DCFS that establishes that DCFS tried to punish her because it does not agree with Plaintiff's views, Plaintiff fails to meet her burden under either the Free Exercise or Establishment Clauses of the First Amendment.

Here, Plaintiff cannot show that the order by Sales and Snowden to stop performing the sign of the cross, Snowden's request to send Plaintiff for a fitness-for-duty examination, or the knowledge of Putting and Stahlman that Plaintiff was told to stop performing the sign of the cross and their failure to stop this order substantially burdened a religious belief or practice in violation of the Free Exercise Clause. Plaintiff merely states that the performance of the sign of the cross at the workplace is a religious expression and that being told to stop performing it violated her right to free religion, without establishing that performance of the sign of the cross is a central religious practice or explaining why being told to stop performing the sign of the cross was a substantial burden on a religious belief or practice. It is Plaintiff's burden to identify a central religious belief or practice that was burdened. *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005). Plaintiff has failed to meet her burden of demonstrating that her right to the free exercise of her religion was violated.

With respect to Plaintiff's claim that the Defendants violated the Establishment Clause, it is Plaintiff's burden to demonstrate that a question of fact remains as to whether the Defendants promoted or affiliated themselves with some religious doctrine or discriminated among people based on their religious beliefs. *County of Allegheny v. American Civil Liberties Union*, 492

27

U.S. 573, 590-91 (1989) (internal citation omitted). Plaintiff admittedly cannot meet her burden of proving a violation of the Establishment Clause because she cannot demonstrate that Defendants tried to punish her because they do not agree with the views of Catholics. Nor has Plaintiff provided any evidence to demonstrate that Defendants discriminated among people based on their religious beliefs. In fact, Plaintiff does not even raise the argument that non-Catholics were treated more favorably. Thus, summary judgment is granted in favor of Defendants on Plaintiff's claim that Defendants violated the Establishment Clause.

### Defendants Davis and McDonald

Defendant Davis' involvement was limited to processing paperwork related to decisions made by others and informing Plaintiff of decisions made by others. There are no allegations of misconduct by Defendant McDonald in Plaintiff's Third-Amended Complaint. (See Defs' 56.1 at ¶¶136-138). Summary judgment is granted in favor of these two Defendants. Hildebrandt v. Illinois Dept. of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted with respect to Count III (Retaliation) and Count IV (42 U.S.C. § 1983 Violations of Speech and Religion). Summary judgment is denied with respect to Count I (ADA), and Count II (Religious Discrimination). Summary judgment with respect to all claims against Defendants Patricia Davis and Jess McDonald is granted. Summary judgment with respect to Defendants Timothy Snowden and Joni Stahlman is denied.

Dated: _September 11, 2006_

JOHN W. DARRAH
United States District Judge

29